UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

S.B. and E.G., by his parent, S.B.,

               **Plaintiffs,**

         - against -

THE NEW YORK CITY DEPARTMENT
OF EDUCATION, NEW YORK CITY
BOARD OF EDUCATION, and CARMEN
FARINA, in her individual and official
capacity as Chancellor of the New York City
School District,

              **Defendants.**

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/25/15

**OPINION AND ORDER**

**14-cv-0349 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.    INTRODUCTION

Plaintiffs S.B. ("the Parent") and E.G. bring this action against

Defendant New York City Department of Education ("DOE") seeking review of

the September 23, 2013, administrative decision of State Review Officer Justyn P.

Bates ("SRO"), which substantially reversed the decision of Impartial Hearing

Officer Mindy G. Wolman ("IHO") finding that E.G.'s Individualized Education

Plan ("IEP") was procedurally and substantively inadequate and that the DOE's

proposed placement did not provide a free appropriate public education ("FAPE")

-1-

under the Individuals with Disabilities Education Act ("IDEA").[1]  Plaintiffs

challenge the SRO's decision and seek reimbursement for the cost of his

enrollment in the Cooke Center for Learning and Development ("Cooke"), a

private school in which the Parent unilaterally enrolled E.G. for the 2012–2013

school year.  The parties have filed cross-motions for summary judgment.  For the

following reasons, plaintiffs' Motion for Summary Judgment is GRANTED in part

and DENIED in part and defendants' cross-motion is GRANTED in part and

DENIED in part.

## II.   STATUTORY FRAMEWORK AND APPLICABLE LAW

Congress enacted the IDEA "to ensure that all children with

disabilities have available to them a [FAPE]" and "to ensure that the rights of

children with disabilities and parents of such children are protected."[2]  States

receiving federal funding under the IDEA are required to make a FAPE available

to all children with disabilities residing in the state.[3]  "To ensure that qualifying

---

[1]      20 U.S.C. § 1400 *et seq*.  The IDEA was amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108–446, 118 Stat. 2647 ("IDEIA"). The statutory citations in this Opinion are to the IDEA as amended by the IDEIA.

[2]      20 U.S.C. § 1400(d)(1)(A), (B).  *See also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (discussing the purposes of the IDEA).

[3]      *See* 20 U.S.C. § 1412(a)(1)(A).  *See also M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).

children receive a FAPE, a school district must create an [IEP] for each such child."[4]  The IEP "'describes the specially designed instruction and services that will enable the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child."[5]

New York has assigned responsibility for developing IEPs to local Committees on Special Education ("CSEs").[6]  The CSE is comprised of the student's parents, a regular or special education teacher, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician, and a parent of another student with a disability.[7]  The CSE "examine[s] the student's level of achievement and specific needs and determine[s] an appropriate educational program."[8]

The CSE does not select the specific school in which the student will

---

[4]     *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  *Accord Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.2d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system).

[5]     *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175).

[6]     *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007).

[7]     *See* New York Education Law ("NY Educ. L.") § 4402(1)(b)(1)(a).

[8]     *R.E.*, 694 F.3d at 175.

be placed, and therefore the IEP does not specify a particular school.[9]  Rather, the DOE provides "general placement information in the IEP, such as the staffing ratio and related services, and then convey[s] to the parents a final notice of recommendation, or FNR[,] identifying a specific school at a later date.  The parents are then able to visit the placement before deciding whether to accept it."[10]

If a parent believes the IEP does not comply with the IDEA, the parent may file a due process complaint with the DOE, requesting an impartial hearing.[11]  Districts are then permitted a thirty-day "resolution period" to address any alleged deficiencies without penalty.[12]  Once the resolution period has run, a parent may continue to a due process administrative proceeding before an IHO.[13]  This decision may be appealed to an SRO.[14]  Either party then has the right to have the SRO's decision reviewed by bringing a civil action in state or federal court.[15]

---

[9]     *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) (holding that an IEP need not specify a specific school site).

[10]     *R.E.*, 694 F.3d at 191.

[11]     *See* 20 U.S.C. § 1415(b)(6).

[12]     *Id.* § 1415(f)(1)(B).

[13]     *See id.* § 1415(f).

[14]     *See id.* § 1415(g)(1); NY Educ. L. § 4404.

[15]     *See* 20 U.S.C. § 1415(i)(2)(A).

Parents who believe that their child has been denied a FAPE may unilaterally place their child in an appropriate private school and seek tuition reimbursement from the state through a due process administrative proceeding.[16] Under the *Burlington-Carter* test, a school district will be required to reimburse the parents for the costs of a private program only if "(1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement."[17]

The first prong of the *Burlington-Carter* test requires a court to review both the procedural and substantive adequacy of the underlying decision.[18] The procedural inquiry examines "'whether the state has complied with the procedures set forth in the IDEA.'"[19] The substantive inquiry asks whether the IEP was

---

[16]     *See School Comm. of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 369–70 (1985) ("*Burlington*"); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993) ("*Carter*").

[17]     *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).

[18]     *See R.E.*, 694 F.3d at 189–90.

[19]     *Id.* at 190 (quoting *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)).

"'reasonably calculated to enable the child to receive educational benefits.'"[20]
Procedural violations entitle the parents to reimbursement "only if they 'impeded
the child's right to a FAPE,' 'significantly impeded the parents' opportunity to
participate in the decision-making process,' or 'caused a deprivation of educational
benefits.'"[21]  "Multiple procedural violations may cumulatively result in the denial
of a FAPE even if the violations considered individually do not."[22]  "Substantive
inadequacy automatically entitles the parents to reimbursement."[23]

    In New York, "the local school board bears the initial burden of
establishing the validity of its plan at a due process hearing."[24]  If a court
determines that either a procedural or substantive inadequacy denied the child a
FAPE, the parents bear the burden of demonstrating that their alternative private
placement was appropriate; that is, whether it is "'reasonably calculated to enable
the child to receive educational benefits.'"[25]  However, parents are "not required . . .

---

[20] *Cerra*, 427 F.3d at 192 (quoting *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982)).

[21] *M.W.*, 725 F.3d at 139 (quoting *R.E.*, 694 F.3d at 190).

[22] *R.E.*, 694 F.3d at 190.

[23] *Id.*

[24] *R.E.*, 694 F.3d at 184.

[25] *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006) (quoting *Rowley*, 458 U.S. at 206–07)).

to prove that the 'private placement furnishes every special service necessary.'"[26]

Finally, the parents must demonstrate that the equities favor reimbursement.

"Important to the equitable consideration is whether the parents obstructed or were

uncooperative in the school district's efforts to meet its obligations under the

IDEA."[27]

       A district court must first determine the scope of the issues properly

before it for review. "The party requesting the due process hearing shall not be

allowed to raise issues at the due process hearing that were not raised in the notice

. . . unless the other party agrees otherwise."[28] Thus, the scope of the inquiry of the

IHO — and therefore of the SRO and a reviewing court — is limited to matters

raised in the hearing request or agreed to by the DOE. However, the Second

Circuit has clarified that "the waiver rule is not to be mechanically applied" and the

"key to the due process procedures is fair notice and preventing parents from

'sandbag[ging] the school district' by raising claims after the expiration of the

---

       [26]    *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 839 (2d Cir.
2014 (quoting *Frank G.*, 459 F.3d at 365)).

       [27]    *Id.* at 840.

       [28]    20 U.S.C. § 1415(f)(3)(B).

resolution period."[29]   The IDEA does not require "that alleged deficiencies be detailed in any formulaic manner" and "the waiver rule limits only what may be raised at the due process hearing."[30]   Thus, "arguments not directly raised in a Due Process Complaint [are] not foreclosed [if] (1) the Due Process Complaint 'provide[s] fair notice to the Department of' the argument at issue; (2) 'both the IHO and SRO reach[] the issue on the merits, giving [the federal court] a record for review'; or (3) the argument goes to 'the heart of this dispute.'"[31]

A school district is not required to designate a specific school in an IEP, but nevertheless may not assign a child to a school that cannot satisfy the IEP's requirements.[32]   However, in assessing whether there has been a substantive violation,"[b]oth parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision."[33]   "[A]n IEP must be evaluated prospectively as of

---

[29]   *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014) (quoting *R.E.*, 694 F.3d at 187 n.4).

[30]   *Id.*

[31]   *C.U. v. New York City Dep't of Educ.*, 23 F. Supp. 3d 210, 223–24 (S.D.N.Y. 2014) (quoting *C.F.*, 746 F.3d at 78).

[32]   *See T.Y.*, 584 F.3d at 420 ("[S]chool districts [do not] have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements.").

[33]   *R.E.*, 694 F.3d at 187.

the time it was created.  Retrospective evidence that materially alters the IEP is not permissible."[34]  Further, "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."[35]

There has been some disagreement among district courts in implementing the Second Circuit's holding in *R.E. v. New York City Department of Education.*[36]  Some courts have held that *any* evidence regarding the proposed placement should be disregarded as "retrospective."[37]  Other courts have allowed such evidence "if the alleged defects were reasonably apparent to either the parent or the school district when the parent rejected the placement, regardless of whether [the student] ever actually enrolled . . . ."[38]  All courts appear to agree that a

---

[34]     *Id.* at 188.

[35]     *Id.* at 195.

[36]     *See N.S. v. New York City Dep't of Educ.*, No. 13 Civ. 7819, 2014 WL 2722967, at *12 (S.D.N.Y. June 16, 2014) ("The case law regarding challenges to a school's ability to provide a FAPE is less than a model of clarity.").

[37]     *See, e.g., J.C. ex rel. C.C. v. New York City Dep't of Educ.*, No. 13 Civ. 3759, 2015 WL 1499389, at * 25 (S.D.N.Y. Mar. 31, 2015) ("[C]ourts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a students would be placed.") (citing *R.B. v. New York City Dep't of Educ.*, No. 12 Civ. 3763, 2013 WL 5438605, at *17 (S.D.N.Y. Sept. 27, 2013)).

[38]     *Scott ex rel. C.S. v. New York City Dep't of Educ.*, 6 F. Supp. 3d 424, 444 (S.D.N.Y. 2014) (quotation marks omitted). *Accord J.S. v. New York City Dep't of Educ.*, No. 14 Civ. 4315, 2015 WL 2167970, at *18–*19 (S.D.N.Y. May 6, 2015).

challenge to a proposed placement will be successful where the evidence establishes that the placement would be unable to satisfy the IEP's requirements.[39] It seems clear, however, that in order to determine if a proposed placement will be unable to comply with a student's IEP, evidence regarding the proposed placement *must* be considered — a categorical ban on *any* evidence relating to the proposed placement would frustrate that inquiry and allow a school district "carte blanche" to assign a child to a school that could not fulfill the requirements of that child's IEP.[40]  Moreover, this is entirely consistent with the holding of *R.E. v. New York City Department of Education*, which concluded:

> We reject . . . a rigid "four corners" rule prohibiting testimony that goes beyond the face of the IEP.  While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP. . . .  For example, . . . if a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this

---

[39]     *See D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 950 F. Supp. 2d 494, 500–01 (S.D.N.Y. 2013) (holding that the school district failed to offer student a FAPE where the IEP required the child to be placed in a "seafood free environment" and the child's mother was informed on a school visit that the school cafeteria was not seafood free); *Scott*, 6 F. Supp. 3d at 444 (finding a substantive violation where the staff at a proposed placement informed the parent that her child would be enrolled in a class with a 12:1:1 ratio instead of the 6:1:1 ratio required by the child's IEP); *J.C.*, 2015 WL 1499389, at * 24 ("If the assigned school cannot meet the requirements of the IEP, then 'the Department has by definition failed to deliver a FAPE.'") (quoting *D.C.*, 950 F. Supp. 2d at 509).

[40]     *T.Y.*, 584 F.3d at 420.

structure operates and why it is appropriate.[41]

Thus, while the IEP must be evaluated prospectively and cannot be *altered* by retrospective testimony about what a school district might have done, testimony explaining how the IEP would be implemented is sufficiently prospective and may be considered by a court.

## III.    LEGAL STANDARD

In the district court, "IDEA actions generally are resolved on summary judgment."[42]  Summary judgment in an IDEA action "is in substance an appeal from an administrative determination, not a summary judgment motion"[43] and "involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions."[44]  Using a preponderance of the evidence standard, the district court inquires "whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs

---

[41]     694 F.3d at 186.

[42]     *S.H. v. New York City Dep't of Educ.*, No. 10 Civ. 1041, 2011 WL 666098, at * 2 (S.D.N.Y. Feb. 15, 2011).

[43]     *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (quotation marks omitted) (brackets omitted).

[44]     *R.E.*, 694 F.3d at 184 (citing *A.C. ex rel. M.C. v. Board of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (quotation marks omitted).

have been appropriately addressed."[45]

The district court should not substitute its own notion of sound educational policy for the determinations by school authorities.[46]  Instead, the court should give "due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."[47]  This standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review."[48]

When the decisions of an IHO and an SRO conflict, the district court should generally defer to the SRO's decision as the "final decision of the state

---

[45]     *D.C.*, 950 F. Supp. 2d at 498 n.1 (citing *Grim*, 346 F.3d at 380–81 (quotation marks omitted).  *Accord* 20 U.S.C. § 1415(i)(2)(c) ("[T]he court . . . shall receive the records of the administrative proceedings . . . shall hear additional evidence at the request of a party . . . [and] basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.").

[46]     *See Board of Educ. v. Rowley ex rel. Rowley*, 458 U.S. 176,  206 (1982).

[47]     *A.C.*, 553 F.3d at 171 (quotation marks omitted) (alterations omitted); *see also C.F.*, 746 F.3d at 77 ("The role of the federal courts in reviewing state educational decisions under IDEA is circumscribed.") (citing *Gagliardo*, 489 F.3d at 112–13 (quotation marks omitted)).

[48]     *M.H.*, 685 F.3d at 244 (quotation marks omitted) (alterations omitted).

authorities,"[49] particularly when the SRO's opinion is thorough and well-reasoned.[50]  However, when

> the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges.[51]

Courts should defer to the IHO when considering an issue that the SRO did not reach.[52]

IDEA has a well-established exhaustion requirement.  Claims must be brought in an administrative proceeding before they may be brought in federal court.[53]  However, the Second Circuit held that the rules regarding waiver should not be "mechanically applied" and that the "key" to the rule is "fair notice and preventing parents from sandbagging the school district by raising claims after the

---

[49]    *F.B. v. New York City Dep't of Educ.*, 923 F. Supp. 2d 570, 578 (S.D.N.Y. 2013) (citing *R.E.*, 694 F.3d at 189).

[50]    *See id.* (quotation marks omitted).

[51]    *Id.* (quotation marks omitted).

[52]    *See C.F.*, 746 F.3d at 77 (citing *M.H.*, 685 F.3d at 252).

[53]    *See, e.g.*, *Cave. v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008).

expiration of the resolution period."[54]

## IV.   REVIEW OF THE ADMINISTRATIVE RECORD

### A.   Underlying Facts

E.G. was thirteen years old at the start of the 2012–2013 school year.[55] E.G. had been classified as having speech and language deficits and a central auditory processing disorder.[56]  As a result, E.G. qualified for special education programs and services.[57]

On or about May 2, 2012, the local CSE convened to create E.G.'s new IEP for the 2012–2013 school year.[58]  The Parent attended the CSE meeting, along with Gavin Schneider (in a dual capacity as district representative and related service provider/special education teacher), Myriam Amber (school psychologist), Isadora DeVeaux (school parent member), Louis Betancourt (classroom teacher),

---

[54]    *C.F.*, 746 F.3d at 78 (citing *R.E.*, 694 F.3d at 187 n.4) (quotation marks omitted) (holding that fair notice is given if the claim is contained in the timely due process complaint notice, is raised at a hearing, or the IHO or SRO reaches the issue on the merits such that there is a record for judicial review).

[55]    *See* E.G. IEP, Parent Exhibit ("PX") A, at 1.

[56]    *See id.*; *see also* IHO Hearing Transcript ("Tr.") at 250:11–15.

[57]    *See* 9/23/13 Decision, *In re New York City Dep't of Educ.*, No. 13-149, from the Record provided to the Court on compact disc, at 3 (New York State Education Department Office of State Review) ("SRO Decision").

[58]    *See* E.G. IEP at 1.

and Nadine Rothman (division head at Cooke).[59]  During the meeting, the CSE

stated its intent to recommend a 15:1 student-to-teacher classroom placement.[60]

The Parent expressed concern and stated a belief that such a setting would not be

sufficient to enable E.G. to learn.[61]  The Parent also requested transition services

but was told that they would not be available.[62]  While the Parent was not

prevented from fully participating in the meeting, the Parent was not present when

Schneider composed the IEP goals using his notes from the meeting.[63]  The

resulting IEP recommended a special education program consisting of, *inter alia*, a

classroom placement with a 15:1 student-to-teacher ratio, related services including

group speech therapy and counseling, and various classroom modifications to

address E.G.'s management needs.[64]

        Under DOE Standard Operating Procedures, E.G.'s proposed school

---

[59]        *See* Tr. at 277:4–11; E.G. IEP at 29.

[60]        *See* Tr. at 158:11–159:16.

[61]        *See id.* at 280:16–281:22.

[62]        *See id.* at 287:5–14.

[63]        *See* 7/7/13 Findings of Fact and Decision of Impartial Hearing Officer
Decision ("IHO Decision"), *In re E.G.*, Case No. 141762, from the Record
provided to the Court on compact disc, at 7; Tr. 132:9–10, 141:5–15.

[64]        *See* SRO Decision at 3.

placement was due to the Parent on August 15, 2012.[65]  On August 16, 2012,

plaintiffs' counsel sent a letter to the DOE informing the DOE that the Parent had

not received E.G.'s proposed placement and that the placement was past-due.[66]  In

an FNR dated August 27, 2012, and received by the Parent on August 30, 2012, the

CSE informed the Parent that the DOE was offering E.G. a placement at Clara

Barton High School ("Clara Barton") in a 15:1 classroom.[67]  Classes began on

September 6, 2012.[68]

   In a September 7, 2012, letter to the CSE chairman, plaintiffs' counsel

sent a letter stating the Parent's intention to visit Clara Barton to determine

---

[65]  *See* DOE Standard Operating Procedures Manual: The Referral, Evaluation, and Placement of School-Age Students with Disabilities ("SOP") at 119 (Feb. 2009), *available at* http://schools.nyc.gov/NR/rdonlyres/5F3A5562-563C-4870-871F-BB9156EEE60 B/0/03062009SOPM.pdf.

[66]  *See* 8/16/12 Letter from Jeremiah Sheehan, Plaintiffs' Counsel, to Marc Jacoby, Chairperson to CSE #10, and Gerard Donegan, Chairperson to CSE #9, ("8/16/12 Sheehan Ltr."), PX C, at 5–6; SOP at 119.

[67]  *See* 8/27/12 FNR, PX C, at 4; Plaintiff's Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 6.

[68]  *See* New York City Department of Education 2012–2013 School Year Calendar ("Calendar") at 1, *available at* http://schools.nyc.gov/Calendar/2012-2013+School+Year+Calendars.htm (click "School Year Calendar" in the first paragraph).

whether it would be an appropriate placement.[69]  The Parent could not plan to visit Clara Barton before classes began in part because the Parent received the letter so close to the start of classes[70] and in part because Clara Barton staff had scheduling conflicts that prevented an earlier visit.[71]  At the time of the visit, the Parent could have withdrawn E.G. from Cooke — where E.G. had been enrolled for several years — without financial penalty.[72]

The Parent visited Clara Barton on September 12, 2012.[73]  Sally Ord, a consulting teacher at Cooke, accompanied the Parent.[74]  During the visit, Clara Barton's assistant principal for special education services told the Parent and Ord that the special education program "was oversubscribed and [Clara Barton] didn't have secure funding . . . for [all of its] special ed[ucation] students . . . ."[75]  While visiting Clara Barton's 15:1 program, the Parent observed that the program was too

---

[69]    *See* 9/7/12 Letter from Sheehan to Jacoby and Donegan ("9/7/12 Sheehan Ltr."), PX C, at 1–2.

[70]    *See* Pl. Mem at 6.

[71]    *See* Tr. at 188:22–189:3.

[72]    *See* IHO Decision at 12.

[73]    *See* 10/22/12 Letter from Sheehan to Stacy Reeves, Impartial Hearing Officer, PX B, at 2.

[74]    *See* Tr. at 485:5–11.

[75]    *Id.* at 486:4–12.

advanced for E.G.[76]  Students in the 15:1 classrooms were functioning at

approximately a ninth-grade level.[77]  E.G.'s ability in reading and math was at

approximately a third-grade level.[78]  School staff at Clara Barton told the Parent

and Ord that the school does not group students based on their functional or

academic levels.[79]  The Parent and Ord also learned that the Clara Barton 15:1

program provided no multi-sensory instruction, scaffolding, modified instructional

materials, pre-teaching, or re-teaching, which the IEP requires.[80]  As a result of the

visit, the Parent concluded that Clara Barton was not an appropriate placement for

E.G. and unilaterally enrolled E.G. at Cooke.[81]

> On October 22, 2012, the Parent filed a Due Process Complaint

Notice under the IDEA alleging that the DOE failed to provide a FAPE.[82]  The

---

[76]     *See id.* at 297:9–17, 486:4–492:3.

[77]     *See* IHO Decision at 13; Tr. at 296:9–297:3; *see also* Tr. at 486:13–20
(noting that the Clara Barton program was a "college-bound" program where the
students work towards a Regents diploma).

[78]     *See* E.G. IEP at 1–2; Tr. at 297:14–17, 404:10–14.

[79]     *See* IHO Decision at 12–13.

[80]     *See id.* at 13; Tr. at 305:12–21, 310:19–311:4, 489:22–491:13,
497:9–499:12; E.G. IEP at 5.

[81]     *See* IHO Decision at 14; Tr. at 311:5–10.

[82]     *See* 10/22/12 Letter from Sheehan to Reeves ("10/22/12 Sheehan
Ltr."), PX B, at 1, 5; SRO Decision at 4.

Parent sought reimbursement for E.G.'s tuition at Cooke, transportation to and from Cooke, and the cost of E.G.'s breakfasts and lunches, which E.G. would have received had E.G. attended public school.[83]   The Parent alleged both procedural and substantive violations:  (1) that the DOE committed a procedural violation because Schneider wrote the IEP goals after the CSE meeting and without the Parent; (2) that the goals and means of measuring progress (also referred to as the "Measurement Method") in E.G.'s IEP were inappropriate in light of E.G.'s needs; (3) that the IEP failed to provide for transition services, as the Parent requested and believed necessary; (4) that the 15:1 classroom ratio required under the IEP could not meet E.G.'s needs; and (5) that Clara Barton was an inappropriate placement for E.G.[84]   The resulting six-day hearing included testimony from eight witnesses, and forty-three exhibits were admitted.[85]

### B.   IHO Decision

On July 7, 2013, the IHO issued an opinion and concluded that the DOE did not provide E.G. with a FAPE for the 2012–2013 school year, as required

---

[83]     *See* 10/22/12 Sheehan Ltr. at 1–6.

[84]     *See id.*

[85]     *See* SRO Decision at 4; Pl. Mem at 8.

under the IDEA.[86]  In addition, the IHO found that: (1) while the CSE's

formulation of the goals after the IEP meeting was a procedural violation, it alone

did not rise to the level of a FAPE violation; (2) while the IEP goals were specific

and detailed, the goal Measurement Method was vague and not aligned with the

measurement criteria; (3) the goals were inconsistent with the student's then-

current level of performance and were not objectively measurable; (4) the CSE

should have at least discussed and considered the Parent's request for transition

services and that, if the CSE had discussed and considered it, the reasonable

conclusion would have been to include transition services in E.G.'s IEP; (5) the

IEP recommendation for placement in a 15:1 classroom would not provide

adequate support for E.G.'s needs; (6) the DOE's placement at Clara Barton was

inappropriate because the 15:1 classroom at Clara Barton operated at a more

advanced level than the student's ability and thus Clara Barton could not provide

the type of instruction and services that the student needed; (7) E.G. was more

likely to experience regression at Clara Barton than to make progress; (8) Cooke

was an appropriate placement; and (9) equitable factors supported the Parent's

tuition reimbursement claim.[87]

---

[86]        *See* IHO Decision at 9, 13.

[87]        *See id.* at 7–13.

C.    SRO Decision

On August 12, 2013, the DOE timely appealed the IHO decision.[88]

The Parent timely submitted an opposition.[89]  On September 23, 2013, the SRO

reversed the IHO order, finding that: (1) the IEP goals were appropriate and that

the IEP met the state's evaluative criteria and addressed E.G.'s needs; (2) the IEP

Measurement Methods were appropriate; (3) the absence of transition services in

the IEP did not deny E.G. a FAPE under the IDEA; (4) the 15:1 classroom at Clara

Barton was appropriate to meet E.G.'s needs and was consistent with state

regulations for a student like E.G.; and (5) the Parent's arguments regarding the

placement were speculative because the Parent rejected the DOE's placement

before the DOE could implement the IEP at Clara Barton, which E.G. did not

attend.[90]  The SRO did not consider the merits of the Parent's argument that Clara

Barton could not implement the IEP by providing E.G. with an appropriate

educational setting, nor did the SRO consider whether Clara Barton had an open

---

[88]    *See* Verified Petition of New York City Dep't of Educ., *In re New York City Dep't of Educ.*, IHO No. 141762, from the Record provided to the Court on compact disc (State Review Office New York State Dep't of Educ. Aug. 14, 2014) ("Pet.").

[89]    *See* Verified Answer of E.G. ex rel. S.B., *In re New York City Dep't of Educ.*, IHO No. 141762, from the Record provided to the Court on compact disc (State Review Office New York State Dep't of Educ. Sept. 5, 2013) ("Answer").

[90]    *See* SRO Decision at 9–18.

seat for E.G.[91]  The SRO also did not consider whether Cooke was an appropriate

placement or whether the equities favored the Parent.[92]  Subsequently, the Parent

filed a timely complaint in this Court.[93]

## V.   DISCUSSION

### A.   IDEA: *Burlington-Carter* Prong One

#### 1.   Adequacy of the IEP

##### a.   Failure to Include the Parent in the Drafting Process

Plaintiffs allege that the IEP was produced in a procedurally

inappropriate manner because the Parent was not present when Schneider drafted

the goals.  Defendants respond that this alleged defect did not meaningfully

prevent the Parent from participating in the development of the IEP nor did it result

in the deprivation of a FAPE.  The SRO "decline[d] to find . . . that the

development of the goals after the May 2012 CSE meeting constituted a procedural

violation that led to a loss of educational opportunity to the student or seriously

infringed on the parent's opportunity to participate in the CSE meeting."[94]  In

---

[91]     *See id.* at 18.

[92]     *See id.* at 19.

[93]     *See* Complaint.

[94]     SRO Decision at 9 (citations omitted).

-22-

stating this conclusion, the SRO did not decide whether a procedural violation

occurred.  The SRO only stated that any procedural violation, if it did occur, did

not infringe on E.G.'s right to a FAPE.[95]  Defendants do not dispute this fair

reading of the SRO decision.[96]

      Because the SRO did not make a determination on this issue, the

Court looks to the IHO decision.  The IHO found that "[t]he exclusion of the

Parent from the opportunity to participate in the development of goals constituted a

procedural IDEA violation."[97]  In explaining this finding, the IHO considered the

procedure that Schneider undertook when preparing the goals in conjunction with

applicable case law.[98]  No party disputes that Schneider alone wrote the IEP goals

---

[95]    *See id.*

[96]    *See* Defendants' Memorandum of Law in Support of Their Cross-Motion for Summary Judgment ("Def. Mem.") at 17 ("The [SRO] similarly found that there was no meaningful deprivation . . . ."); Defendants' Reply Memorandum of Law in Further Support of Their Cross Motion for Summary Judgment at 4 ("[N]o administrative officer . . . found that the drafting of the goals after the committee meeting constituted a denial of a [FAPE] . . . .").

[97]    IHO Decision at 8.

[98]    *See* Tr. at 142:3–21; *see also* IHO Decision at 7 ("Although Mr. Schneider did not testify about how [E.G.'s] goals were actually developed, he testified that a student's 'academic areas' and 'academic struggles' are discussed at CSE meetings and that he writes down the area and confirms with the parent and school that the identified areas are the ones in which goals need to be written. (Tr. at 140–141.)  It is Mr. Schneider's practice to write the goals himself after the CSE meeting. (Tr. at 141)").

using his own meeting notes after attending the CSE meeting. The IHO also found that this procedural violation did not lead to a loss of educational opportunity to E.G. or seriously infringe on the Parent's ability to participate in the IEP meeting.[99] The IHO made these well-reasoned conclusions based on the Record using her knowledge and experience regarding proper implementation of educational policy. Because district courts decline to substitute their own notions of educational policy for well-reasoned determinations by the IHO, I defer to the IHO and concur with her finding that the defendants' failure to include the Parent in the drafting process was a procedural violation that did not deny E.G. a FAPE.[100]

> ### b. The IEP Goals

Plaintiffs make two main arguments regarding the IEP goals. *First*, they state that the SRO erred by holding that the Measurement Methods in the IEP goals were not vague. *Second*, they claim that the Measurement Methods were not sufficiently individualized or reasonably realistic because Schneider — and by extension the CSE — did not take into account E.G.'s then-current level of

---

[99]    *See E.A.M. v. New York City Dep't of Educ.*, No. 11 Civ. 3730, 2012 WL 4571794, at *8 (S.D.N.Y. Sept. 29, 2012) (recognizing that the IDEA does not require that goals be drafted at the CSE meeting); *J.G. v. Briarcliff Manor Union Free Sch. Dist.*, 682 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (explaining that parental presence is not required during actual goal drafting); IHO Decision at 8.

[100]    *See Rowley*, 458 U.S. at 206.

academic skills or functioning when drafting the goals.  Plaintiffs also claim that

the Measurement Methods are wholly boilerplate.  In particular, plaintiffs object to

the vague and non-individualized language stating that E.G. would show progress

toward seventeen of the twenty-nine goals when E.G. "demonstrate[s] movement

on the way to [ninth] grade level."[101]  On the other hand, defendants parse the

words "demonstrate movement on the way" to mean that E.G. only needs to make

some incremental improvement in order to fulfill the goal.  Defendants also argue

that the Measurement Methods are not vague because they are consistent with state

regulations and that the IEP's provisions allowing a number of possible

Measurement Methods are not inappropriate.

      Crediting the testimony of Schneider, the SRO held that the phrase

"on the way to grade level skills" is not vague.[102]  Instead, the SRO concluded that

the phrase is in alignment with New York learning standards and the core

curriculum[103] and thus is sufficiently measurable so as not to deny a FAPE.[104]

---

[101]     E.G. IEP at 16.

[102]     *See* SRO Decision at 10; Tr. at 144:3–146:11.

[103]     The State of New York has promulgated regulations regarding measurable annual goals in IEPs.  *See* 8 New York Codes, Rules, and Regulations ("NYCRR") § 200.4(d)(2)(iii).  Additionally, the DOE has released a Guide to Quality IEP Development and Implementation, which describes how a CSE committee should determine measurability of annual goals.  *See* Guide to Quality Individualized Education Program Development and Implementation ("Guide"),

-25-

Under this reading, the IEP goals and Measurement Methods would allow the student to develop grade-level appropriate skills because "a special education teacher would modify the student's grade level assignments to the student's instructional level . . . ."[105]  The SRO also held that the IEP goals were sufficiently aligned with the student's needs and were sufficiently individualized because the "teacher could independently determine a more specific manner by which to measure the student's progress toward his goals."[106]  For the reasons that follow, these conclusions are neither well-reasoned nor do they accurately reflect the evidence in the Record.

*First*, when the SRO concluded that the Measurement Methods were sufficient under New York regulations, the SRO merely quoted the IEP without further explanation.[107]  In other words, the SRO did not address in any substantive way *why* the Measurement Methods were sufficient under the state regulations. The SRO made only a conclusory statement.

_____

Office of Special Education Memorandum 32–33 (Dec. 2010) *available at* http://www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf.

[104]    *See id.*

[105]    SRO Decision at 10 (citing Tr. at 144–146).

[106]    *Id.* at 11 (citation omitted).

[107]    *See id.*

*Second*, the SRO only cursorily addressed whether the IEP goals were appropriate and individualized as required by state law and the prevailing jurisprudence.[108]  After acknowledging the IHO's conclusion that the grade-level skills were inappropriate because they were not matched to E.G.'s functional level, the SRO argued that the goals "were in alignment with the New York State learning standards and core curriculum" and cited to Schneider's testimony in support.[109]  However, whether or not the IEP goals were aligned with the State's standards and curriculum says nothing about whether or not the IEP goals were appropriate and individualized to E.G.  For example, the goal that "[E.G.] will develop & utilize study strategies . . . on the way to grade level skills" may well be in alignment with state statutes and regulations, but it does not follow that such a goal is appropriate and individualized to E.G.  Moreover, the SRO's summation that "a special education teacher *would* modify the student's grade level assignments to the student's instructional level in order to allow the student access to the grade level skills"[110] serves as retrospective evidence that materially alters the IEP because it presumes how the IEP would be implemented at Clara Barton in

---

[108]    *See* 8 NYCRR § 200.4; *R.E.*, 694 F.3d at 175.

[109]    SRO Decision at 11.

[110]    *Id.*

the future.[111]  In reaching this conclusion, the SRO went beyond the four corners of the IEP and the evidence known to the parties before the IEP's implementation.[112]

       *Third*, the SRO incorrectly concluded that the Measurement Method phrase "on the way to grade level skills" is not vague.  This conclusion belies common sense.  Plaintiffs articulate the issue in their reply brief:  "But what does it mean for a student with third-grade skills to 'make progress in the direction' of a ninth-grade level?  Would achievement of fourth-grade skills indicate that the IEP is succeeding?"[113]  The SRO cited to the Guide as evidence of the phrase's compliance with state requirements.  However, the phrase does not conform to the Guide's Quality Indicators regarding annual goal drafting.[114]  Instead, the Guide requires much more specific language to avoid the very vagueness that plaintiffs alleged in their Complaint Notice.  The Guide specifically describes as "not

---

[111]    *See R.E.*, 694 F.3d at 188.

[112]    *See A.M. v. New York City Dep't of Educ.*, 964 F. Supp. 2d 270, 286 (S.D.N.Y. 2013).  *Cf. M.S. v. New York City Dep't of Educ.*, No. 13 Civ. 3719, 2013 WL 6028817, at *4 n.8 (S.D.N.Y. Nov. 13, 2013).

[113]    Plaintiffs' Reply Memorandum of Law in Opposition to Defendants' Cross-Motion for Summary Judgment and in Further Support of Plaintiffs' Motion for Summary Judgment, at 5 (citing Def. Mem. at 19).

[114]    *See* Guide at 35.

specific enough" language such as "will improve,"[115] a phrase synonymous with the language in E.G.'s IEP: "on the way." Neither the SRO nor the defendants even attempt to explain how the IEP language is more specific than the Guide's impermissible non-specific examples. In fact, the phrases have nearly identical meanings and are impermissibly vague.

The SRO attempted to use Schneider's explanation of the phrase "on the way to grade level" to resurrect the IEP. However, Schneider's statements merely describe New York educational policy and the goal of "closing the achievement gap."[116] While his articulation of New York policy may be correct, Schneider's statements say nothing about E.G.'s IEP in particular. Schneider even admits that his description refers to general state policy.[117] On these facts and conclusions, I find that the SRO's conclusions on this topic deserve no deference because they are not well-reasoned.

By contrast, the IHO opinion regarding the adequacy of the IEP goals

---

[115]    *Id.* at 32 ("Terms such as 'will improve' . . . , 'will increase' . . . , and 'will decrease' . . . are not specific enough to describe what it is the student is expected to be able to do.").

[116]    *See* Tr. at 144:3–146:11.

[117]    *See id.* at 144:21–25 ("MS. HORT CLEMENT:  . . . You're not talking about [E.G.].  You're talking about the standards, the grade standards--. MR. SCHNEIDER: (Interposing) Those are the standards, yes.").

is both well-reasoned and well-considered.  The IHO discussed how the Measurement Methods align with the measurement criteria and then described the methods — which are identical for many of the goals — to show that they were "more of an 'anything goes' laundry list of possible Measurement Methods . . . ."[118]  The IHO also reviewed testimony and noted that the measurement criteria was objective before concluding that the inappropriate Measurement Methods constituted a violation of the IDEA.[119]  Therefore, I defer to the IHO's well-reasoned opinion that the goal's Measurement Methods are inappropriate and violate the IDEA.

### c.    Transition Services

The DOE must provide post-secondary school transition services to a student with disabilities no later than the school-year when the student turns fifteen.[120]  The DOE may provide transition services "at a younger age, if deemed appropriate."[121]  E.G. did not turn fifteen until after the 2012–2013 school year.[122]

_____

[118]    IHO Decision at 7–8.

[119]    *See id.* at 7.

[120]    *See* 8 NYCRR § 200.4(d)(2)(ix); *see also id.* § 200.1(fff) (defining transition services).

[121]    *Id.* § 200.4(d)(2)(ix).

[122]    *See* IHO Decision at 5.

The parties do not contest that the Parent requested transition services at the IEP meeting.  Nonetheless, the CSE rejected the request outright, without consideration or discussion.  Defendants contend that because the student was "age appropriate" in his "vocational and occupational planning," state law did not require the CSE to include transition services in the IEP.[123]

The SRO found that "the CSE's decision to wait until the following year to recommend transition services did not rise to the level of a FAPE violation."[124]  This determination was based on the results of a vocational assessment,[125] which the CSE relied on and which determined that E.G.'s "vocational and occupational planning was essentially age appropriate, reality based[,] and positive in orientation."[126]  The SRO also relied on Schneider's

---

[123]    See Def. Mem. at 20; *see also* 2/12/11 Psychoeducational Evaluation of E.G. ("Psychoeducational Eval."), DOE Exhibit ("DX") 9, at 3.

[124]    SRO Decision at 15.

[125]    *See generally Functional Vocational Evaluation*, National Secondary Transition Technical Assistance Center at the University of North Carolina – Charlotte, http://www.nsttac.org/content/functional-vocational-evaluation ("This evaluation involves an assessment process that provides information about job or career interests, aptitudes, and skills. Information may be gathered through situational assessment, observations or formal measures, and should be practical. The IEP team could use this information to refine services outlined in the IEP.") (citation omitted).

[126]    SRO Decision at 15 (citing Psychoeducational Eval. at 3).

-31-

testimony that E.G.'s diploma objectives put E.G. on a "more educational track," not a vocational track.[127]

Because the SRO considered the vocational assessment and relevant testimony in conjunction with the applicable regulation, I conclude that the SRO made the well-reasoned determination that E.G. did not require transition services for the 2012–2013 school year.[128]  While the Parent did request transition services and may have honestly believed that E.G. should have received them, such a request or belief does not bind the CSE.[129]  In light of the foregoing, I conclude that the SRO's opinion deserves deference regarding this issue, and therefore hold that the DOE was not required to provide transition services to E.G. in the 2012 IEP.

### d.    15:1 classroom

Plaintiffs assert that E.G. requires a small, supportive classroom with two teachers so that E.G. can receive adequate one-on-one attention and direction. They also assert that E.G. needs certain classroom "supports," including multi-sensory instruction, scaffolding, modified instructional materials, and re-teaching.

---

[127]    *Id.* at 16.

[128]    *See id.*

[129]    *See Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) ("What the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents.") (quotation marks omitted) (citations omitted).

Because of these requirements, plaintiffs insist that a classroom with a 15:1 student-to-teacher ratio — as the IEP requires — would be insufficient to meet E.G.'s needs.  Defendants contend that the 15:1 classroom met the state's requirements for a student with E.G.'s disabilities.  Defendants also argue that the 15:1 classroom was appropriate because the Parent wanted E.G. to attend a community school and not a District 75 specialized school.[130]  Classrooms with a ratio smaller than 15:1 were only available at District 75 specialized schools, not community schools.  Further, defendants contend that the CSE was well aware of E.G.'s needs, deficits, and performance levels and prepared an IEP that would provide a FAPE.  Because numerous supports and strategies were included in the IEP, defendants argue that the recommended program was reasonably calculated for the student to make at least some progress, as required under law.[131]

---

[130]     *See generally* About District 75 Schools, New York City Dep't of Educ., http://schools.nyc.gov/Academics/SpecialEducation/D75/AboutD75/default.htm ("District 75 provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled.").

[131]     *See, e.g.*, *J.G. v Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 639 (S.D.N.Y. 2011) ("A district is not required to maximize each child's educational capacity, but the door of public education must be opened in a meaningful way, and the IEP must provide the opportunity for more than only trivial advancement.") (quotation marks omitted) (citations omitted).

The IHO and the SRO disagree as to whether a 15:1 classroom recommendation provides the level of support that E.G. requires.  The IHO held that it did not, citing to testimony of the Cooke assistant head of school and the Cooke head teacher.  By contrast, the SRO cited to Schneider, the district special education teacher, and concluded that "the evaluations available to the CSE reflected that [E.G.'s] difficulties with attention, cognition processing, and social skills did not rise to the level that the student would not receive educational benefits in a 15:1 special class."[132]

The SRO's conclusion is not supported by the Record.  The parties do not dispute that the Cooke assistant head of school and the Cooke head teacher not only knew E.G. but were also his classroom teachers.[133]  The parties also do not dispute that Schneider, who composed the IEP, had never met E.G.[134]  While these facts are not dispositive, the SRO's reliance on *one* district special education teacher's contention that E.G. did not require "any additional teaching support"[135] over the testimony of *two* teachers who knew E.G. and taught E.G. in class —

---

[132]     SRO Decision at 14.

[133]     *See* Tr. at 387:24–388:2, 429:18–25.

[134]     *See id.* at 133:18–20.

[135]     *Id.* at 163:4–6.

*without noting the IHO's finding of credibility for or against any witness* — flies in the face of reason.  True, the SRO did support his point by citation to assessment reports by an occupational therapist,[136] a social worker,[137] a speech pathologist,[138] and a school psychologist,[139] but none of those reports mention or even allude to the appropriate student-to-teacher ratio for E.G.  Instead, they recommended those additional services (occupational therapy, speech therapy, etc.) that would have been appropriate.  The reports' contents and conclusions therefore do not bear on the 15:1 issue.  For these reasons, I find that the SRO's conclusion regarding the

---

[136]    *See* SRO Decision at 14 ("The occupational therapist who evaluated [E.G.] indicated that although the student's teachers and [the Parent] reported that [E.G.] exhibited difficulties with maintaining attention, the student did not engage in hyperactive behavior and did not require OT services to address such concerns.") (citation omitted).

[137]    *See id.* ("The social worker reported that [E.G.]followed directions and liked to please but exhibited difficulty with processing information.  The social worker also reported that [E.G.] demonstrated progress and was developing various skills to increase his independence.  According to the social worker, [E.G.] exhibited difficulty focusing and needed support regarding social skills.") (citations omitted).

[138]    *See id.* ("The speech-language pathologist reported that the student easily engaged in conversation but demonstrated difficulties with listening comprehension.") (citation omitted).

[139]    *See id.* ("Although the school psychologist indicated that during the assessment process the student was easily discouraged and lacked efficiency regarding time to compete tasks, the student was well related.") (quotation marks omitted) (citation omitted).

15:1 classroom recommendation was not well-reasoned.

In contrast, the IHO made the well-reasoned conclusion that "the only reason the CSE recommended a 15:1 program was that it was the only small class (self-contained) setting available in a DOE high school."[140]  The IHO further concluded that

> [t]he testimony at the hearing and [E.G.'s] evaluations and progress report do not support a finding that his special education needs could be met in [a 15:1] setting, or that [E.G.] would received [sic] meaningful educational benefits in that setting.  A 15:1 program would not have provided [E.G.] with the high level of support that [E.G.] needed to remained [sic] focused and to benefit from instruction.  His speech and language disorder, auditory processing disorder, and slow processing speed warrant small group instruction and a level of 1:1 attention and support that cannot be provided in a classroom with one teacher and 15 students.[141]

In support, the IHO cited to the testimony of the Parent, two of E.G.'s teachers at Cooke, a Cooke teaching consultant/CSE liaison who also knows E.G., and a pediatric neuropsychology fellow at Lenox Hill Hospital Center for Attention and Learning who performed an evaluation of E.G.[142]  The IHO described these

---

[140]    IHO Decision at 5.

[141]    *Id.* at 8–9.

[142]    *See id.* at 9 & n.3; Tr. at 522:18–19, 526:9–11.

witnesses' testimony as "detailed and convincing."[143]   Based on the foregoing, I

find that the IHO's opinion on this issue was well-reasoned and thus defer to the

IHO's conclusion that a 15:1 classroom could not meet E.G.'s needs and that E.G.

was denied a FAPE for the 2012–2013 school year.

### 2.      Recommended Placement at Clara Barton

#### a.      Waiver of the Recommended Placement Claim

Defendants argue that plaintiffs waived the argument that Clara

Barton was inappropriate because it did not have a seat for E.G.   However,

defendants also admit that plaintiffs set forth allegations in the Complaint Notice

regarding Clara Barton, including that it was oversubscribed and lacked funding

for all students, and that witnesses testified about these topics.[144]

The Complaint Notice contains several statements regarding the Clara

Barton Placement.   For example, plaintiffs note that when the Parent visited Clara

Barton, "[t]he school staff indicated that the special education program [had] many

more IEP students than it [was] currently funded for."[145]   As a result, "the school

---

[143]      *See* IHO Decision at 9.

[144]      *See* Def. Mem. at 27.

[145]      10/22/12 Sheehan Ltr. at 3.

does not have enough teachers to meet the demand."[146]  Further, plaintiffs were concerned that "[t]here did not appear to be any individualization . . . or any differentiation" in the classes.[147]  In the Complaint Notice, plaintiffs compared E.G.'s needs with the situation at Clara Barton, noting that E.G. "has problems focusing and staying on point, needs targeted [and] individualized instruction, whereas the school indicated a one-size-fits all approach."[148]  "The program at the school does not appear to be one that will provide an appropriate education for" E.G.[149]  The SRO even acknowledged plaintiffs' allegation in the Complaint Notice that Clara Barton "was underfunded and not ready and able to implement the student's IEP recommendations, including management strategies and related service recommendations."[150]  The Parent also testified that Clara Barton "had funding for 191 [special needs] students, but they had 240 students."[151]

In light of the foregoing, defendants cannot claim that they had no notice of the contested allegation.  The Complaint Notice, SRO opinion, and

---

[146]     *Id.*

[147]     *Id.*

[148]     *Id.*

[149]     *Id.*; *see also id.* at 5.

[150]     SRO Decision at 3–4.

[151]     Tr. at 291:1–6.

testimony all reference Clara Barton, the over-subscription, or both.  Additionally, the allegation goes to the heart of the present dispute.[152]  Further, this allegation could not be a surprise to defendants because the issue was discussed during the proceedings, administrative decisions, or both.

Defendants also attempt to characterize plaintiffs' argument — that the offer to attend Clara Barton was "not real" because the 15:1 classrooms were oversubscribed and the school did not have funding for additional students[153] — as a contention that the school could in no way accommodate the student.[154]  But this unfair reading misses plaintiffs' broader point.  The real issue, as plaintiffs have repeated time and again, is that the school had more special education students enrolled than it had a budget or teachers for, and this circumstance made adherence to the IEP impossible.

Defendants also briefly state that plaintiffs abandoned this line of argument during the appeal before the SRO and only now seek to return to it.  As discussed earlier, plaintiff made these arguments well before the SRO hearing.  Furthermore, plaintiffs had "neither the responsibility nor the right to appeal the

---

[152]  *See C.F. ex rel. R.F.*, 746 F.3d at 78 (holding that an issue that goes to the heart of a dispute is not necessarily foreclosed).

[153]  *See* Pl. Mem. at 25.

[154]  *Compare id. with* Def. Mem. at 25–26.

favorable decision by the [IHO] since [plaintiffs] were not aggrieved by [the IHO] decision."[155]   In light of the foregoing, plaintiffs' claim is properly before this Court.

### b.      Merits of the Recommended Placement Claim

Plaintiffs contend that the Clara Barton placement was inappropriate or unavailable.  When the Parent visited the school, the Parent's observations and conversations with teachers and administrators supported the reasonable conclusions that (1) the school was oversubscribed; (2) the school was unable to implement the IEP because the 15:1 class did not provide scaffolding or multi-sensory instruction; (3) the teachers did not know and were not allowed to know the functional levels of their students and thus could not modify the curriculum as prescribed in E.G.'s IEP; and (4) the 15:1 class was taught six grade levels higher than E.G.'s functional ability.[156]   Plaintiffs do not make these allegations on the sole ground that the other students at Clara Barton are under-served.[157]   Instead, plaintiffs insist the allegations are based on information that the Parent learned

---

[155]      *Antkowiak ex rel. Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir. 1988) (quotation marks omitted) (citation omitted).

[156]      *See* Pl. Mem. at 30–31.

[157]      *See id.* at 30.

during the visit to Clara Barton.[158]

The SRO and defendants contend that plaintiffs' arguments are

speculative and therefore inappropriate[159] because

> where a parent enrolls the child in a private placement before the
> time that the district would have been obligated to implement the
> IEP placement, the validity of proposed placement is to be judged
> on the face of the IEP, rather than from evidence introduced later
> concerning how the IEP might have been, or allegedly would have
> been, implemented.[160]

Both the SRO and defendants read *R.E.* broadly, but courts in this District have

adopted a narrower reading.[161]   To support their reading, defendants cite cases for

---------------

[158]    *Cf. R.E.*, 694 F.3d at 195.

[159]    *See* Def. Mem. at 26.

[160]    *A.M.*, 964 F. Supp. 2d at 286 (citing *R.E.*, 694 F.3d at 186–87; *Grim*, 346 F.3d at 381–82).

[161]    *See  Scott ex rel. C.S. v. New York City Dep't of Educ.*, 6 F. Supp. 3d 424, 436 (S.D.N.Y. 2014) ("Like an IEP, a recommended placement may be substantively inappropriate.") (citation omitted); *V.S. ex rel. D.S. v. New York City Dep't of Educ.*, 25 F. Supp. 3d 295, 300 (E.D.N.Y. 2014) ("Depending on the needs of the student, the characteristics of the specific school site can be an important factor in assessing the adequacy of the IEP and its implementation."); *J.F. v. New York City Dep't of Educ.*, No. 12 Civ. 2184, 2013 WL 1803983, at *2–*3 (S.D.N.Y. Apr. 24, 2013) ("While it is possible to read *R.E.*'s holding broadly enough to exclude all prospective challenges to a student's classroom placement, the Court declines to do so absent more explicit instruction from the Second Circuit."); *J.S.*, 2015 WL 2167970, at *19 ("[Plaintiff] testified that she visited [the school] twice. During these visits, she learned that: (1) a significant portion of the students at [the school] are non-native English speakers who have weaker language skills than DS has, and (2) the large student body produces noisy

-41-

the proposition that information obtained from visits to the proposed school must be speculative.  But both cases were decided *prior to R.E.*, the prevailing Second Circuit opinion.[162]

Defendants also cite to *R.B.*,[163] a non-binding Second Circuit summary order, but *R.B.* is distinguishable from the *R.E.* line of cases.  In *R.B.*, D.B.'s parent visited the school during the summer before classes began but "didn't feel like [she] got an impression of the actual class that D.B. was to be in because there were no kids there."[164]  Accordingly, the court found that information that D.B.'s parent acquired during the visit to the school was speculative.  The circumstances in *R.B.* differ significantly from the case at bar, where the Parent visited the oversubscribed 15:1 special education classrooms at Clara Barton *after* instruction for the school year had begun.  Because the Parent was able to observe Clara Barton students and teachers interact in the classroom, the Parent got a full and accurate impression of the school and 15:1 classes *as they would be if E.G.*

------------------------------------------------

common areas, which would trigger DS's anxiety.  These objections are not inherently impermissibly speculative.") (citations omitted).

[162]     *See* Def. Mem. at 26 (citing *A.M.*, 964 F. Supp. 2d at 286; *K.L.*, 530 Fed. App'x at 87).

[163]     *R.B. ex rel. D.B v. New York City Dep't of Educ.*, 589 Fed. App'x 572 (2d Cir. 2014).

[164]     *Id.* at 576 (quotation marks omitted).

*enrolled*.  Therefore, the Parent knew that enrolling E.G. at Clara Barton would result in E.G.'s placement into an oversubscribed classroom not conforming to the IEP.

Against the weight of authority, the SRO chose to favor his own reading.[165]  The SRO attempted to bolster his argument by citation to two non-binding Second Circuit summary orders, which stand for the unremarkable propositions that "[p]arents are entitled to rely on the IEP for a description of the services that will be provided to their child"[166] and that "[t]he appropriate inquiry here is into the nature of the program actually offered in the written plan, not a retrospective assessment of how that plan would have been executed."[167]  Absent further guidance from the Second Circuit, I continue to read *R.E.* narrowly[168] and hold that the Court may consider relevant prospective information about Clara

---

[165]    *See* SRO Decision at 17 ("While several district courts have, since *R.E.* was decided, continued to wrestle with this difficult issue regarding challenges to the implementation of an IEP made before the student begins attending the school and taking services under the IEP, I now find it necessary to depart from those cases.") (citations omitted).

[166]    *Id.* (citing *P.K. & T.K. ex rel. S.K. v. New York City Dep't of Educ.*, 526 Fed. App'x 135, 141 (2d Cir. 2013)).

[167]    *Id.* (citing *K.L. v. New York City Dep't of Educ.*, 530 Fed. App'x 81, 87 (2d Cir. 2013) (quotation marks omitted)).

[168]    *See  K.R. ex rel. Matthew R. v. New York City Dep't of Educ.*, No. 13 Civ. 7464, 2015 WL 1808911, at *3 (S.D.N.Y. Apr. 20, 2015) (Scheindlin, J.).

Barton that the Parent gathered while investigating the adequacy of the proposed placement.

Defendants contend that certain testimony was speculative and therefore may not be considered by this Court. *First*, defendants argue that just because "witnesses were told that the Clara Barton program was oversubscribed does not mean the Student would not have had a seat had [E.G.] attended, or that the school would not have accommodated" E.G.[169]  Defendants may well be correct.  Just as Clara Barton had attempted to accommodate forty-nine more students than it had funding for at the start of the 2012–2013 school year, the school may have attempted to accommodate E.G. as well.  However, this argument misses the point.  Even if Clara Barton would have attempted to accommodate E.G., the school necessarily would have violated E.G.'s IEP because the 15:1 classrooms were oversubscribed.  Thus, Clara Barton could not meet the IEP's requirements.  The fact that the classrooms were oversubscribed was not speculative because the Parent visited the school after classes had begun for the school year and was told that the classes were oversubscribed by Clara Barton staff.[170]

---

[169]     Def. Mem. at 27 (citing Tr. at 290–291, 486, 518–519).

[170]     *See* 10/22/12 Sheehan Ltr. at 2 (noting that on September 12, 2012, the Parent visited Clara Barton and met with and was shown around by school

Despite the SRO's belief that "it is undisputed that the parents . . . rejected the IEP before visiting the assigned school,"[171] merely stating an alleged fact does not make it true.  In an attempt to support this conclusion, the SRO cited to a September 7, 2012 letter from the Parent to the DOE,[172] which specifically stated that the Parent had arranged a visit to Clara Barton *to determine if its program would have been appropriate for E.G.*[173]  The Parent also mentioned in that letter that the Parent had chosen Cooke as the default placement.  However, the Parent was all but compelled to enroll E.G. in Cooke because the DOE had failed to inform the Parent of E.G.'s proposed placement until *twelve days after the date required* by the SOP and a mere *ten days before school was due to begin*.[174]  A plain reading of the September 7, 2012 letter makes it clear that "[t]he parent provided the CSE with timely and appropriate notices regarding [the] rejection of

staff); Calendar at 1 (stating that school session begins for all students on Sept. 6, 2012).

[171]    SRO Decision at 18.

[172]    *See* 9/7/12 Sheehan Ltr.

[173]    *See id.* at 2.

[174]    *See* IHO Decision at 17 ("[I]t was the DOE which had been remiss. . . . The Parent fully cooperated with the CSE in all respects."); *see also* 8/16/12 Sheehan Ltr. at 5–6 (notifying the DOE that E.G. had not received his proposed placement on August 16, 2012, the day after the placement was due under DOE guidelines).

the CSE's program and placement recommendations,"[175] in part because the Parent did not make the final decision to reject the Clara Barton placement until after the Parent had visited the school.[176]  Additionally, the SRO's unsupported statement on this subject is contradicted by the Record.  Plaintiffs' Verified Answer, which was filed during the appeal to the State Review Office, unambiguously contradicts the SRO's statement.[177]

 *Second,* defendants argue that "[t]estimony that certain teachers did not know the functional level of their students does not mean that instruction would not have been modified for the Student and his abilities, had [E.G.] attended [Clara Barton]."[178]  In a footnote, the SRO briefly mentioned this issue regarding function-level grouping.  After stating that the Record offers "little information

---

[175]     IHO Decision at 17.

[176]     *See id.* ("The DOE contends that the Parent rejected the CSE's recommendations prematurely because [the Parent] sent a 10-day notice of . . . intent to unilaterally place [E.G.] at Cooke prior to receiving the FNR.  I do not agree . . . ."); Tr. at 311:5–10 ("MR. SHEEHAN: So after visiting the school, did you decide that — whether or not it was appropriate?  [THE PARENT]: I didn't think that Clara Barton High School was appropriate for Elisha.").

[177]     *Compare* Pet. ¶ 5 ("By letter dated August 16, the Parent rejected the DOE placement and advised the DOE of [E.G.'s] re-enrollment . . . at Cooke.") (citations omitted) *with* Answer ¶ 5 ("Respondent denies the allegations contained in Paragraph 5, refers to referenced exhibits, and denies any allegation inconsistent therewith.").

[178]     Def. Mem. at 27.

regarding . . . functional grouping," the SRO cited nine transcript pages regarding the topic.[179]  A cursory reading of the transcript finds even more testimony, much of it illustrative, regarding whether the Clara Barton classrooms are grouped functionally.[180]  Against this well-developed Record, the SRO cited a single page of transcript testimony for the proposition that Clara Barton follows State guidelines regarding functional grouping.[181]  In a bewildering fashion, the SRO then concluded that the evidence shows "how reliable functional grouping evidence is not static and depends to a very large degree on a student's actual enrollment and attendance at the public school."[182]  This conclusory and general statement finds no support in the Record — and certainly not from the single page that the SRO cited.

Further, the relationship among functional grouping, enrollment, and attendance was not discussed by the witness that the SRO cited.  The SRO does

---

[179]     SRO Decision at 18–19 n.12.

[180]     *See, e.g.*, Tr. at 295:19–20, 302:16–18, 492:25–493:15, 494:20–25.

[181]     *See* SRO Decision at 19 n.12 ("In contrast, the assistant principal at the assigned public school testified that the assigned school followed State guidelines regarding functional grouping.") (citing Tr. at 199).  *Accord* Tr. at 199:6–13 ("MS. HORT CLEMENT: Okay. Are you aware of the Department of Education's responsibilities to group students by functioning levels and by age? . . .  MS. LEYKINA: Of course.")).

[182]     *Id.*

cite to testimony that Clara Barton teachers had access to student IEPs and were required to affirm that they have reviewed the IEPs.[183]  But how the SRO concluded that Clara Barton teachers engaged in functional grouping from that evidence remains unclear.

In sum, plaintiffs' contentions are based on the Parent's visit to Clara Barton, the Parent's observations there, and the Parent's conversations with teachers and administrators.[184]  The Parent had a right to evaluate the school to gain information regarding whether the school was an appropriate placement.[185]  While defendants are correct that the Court should inquire into the nature of the program as articulated in the written IEP and should not assess the plan retrospectively, a prospective assessment is not necessarily limited to the four corners of the IEP.[186]

Based on the arguments just discussed, the SRO overturned the IHO's opinion regarding the adequacy of the Clara Barton recommendation.  For the foregoing reasons, I find that the SRO's opinion on this issue was not well-

---

[183]    *See* Tr. at 198:22–199:5.

[184]    *See* IHO Decision at 12 ("The Parent then visited the school to determine whether the placement was appropriate for" E.G.).

[185]    *See Scott*, 6 F. Supp. 3d at 441; *see also M.S.*, 2013 WL 6028817, at *4 n.8 (holding that the court may consider evidence that the school may not adhere to the IEP but cannot consider speculation regarding the same).

[186]    *See K.L.*, 530 Fed. App'x at 87.

reasoned and defer instead to the opinion of the IHO.

The IHO found that the Parent's testimony regarding the Parent's visit to the school was relevant.[187]  The IHO also found that the DOE did not meet its burden of proving that the Clara Barton placement would have been appropriate, as required under the IEP.[188]  In support of her conclusions, the IHO cited to testimony from a number of witnesses, including some produced by the DOE, and articulated several reasons why that testimony does not support the DOE's contentions.[189]  In fact, the IHO stated that testimony by some DOE witnesses actually supports plaintiffs' contentions.[190]  Because the Court cannot substitute its own notion of educational policy for the sound and well-reasoned determinations

---

[187]    *See* IHO Decision at 11–12.

[188]    *See* NY Educ. L. § 4404(c); IHO Decision at 11, 13.

[189]    *See* IHO Decision at 13 ("The DOE has the burden of proving that [E.G.'s] special education needs would have been met at Clara Barton and that [E.G.] would have been appropriately grouped for instructional purposes at the school (as of the time that the FNR was issued).  It did not meet this burden.  Ms. Leykina's testimony does not support a finding that the Student's IEP management and instructional needs (constant refocusing, check-ins, etc.) would have been addressed in the Clara Barton program or that the 15:1 program would have been able to implement the multi-sensory and other instructional techniques (pre-teaching/re-teaching, scaffolding, etc.) that the Student requires in order to benefit from classroom instruction.  Her testimony also did not support finding that the program would have provided [E.G.] with instructional materials at [E.G.'s] academic and functional level.").

[190]    *See id.*

by school authorities and because I find that the IHO's opinion is well-reasoned, I defer to the IHO's determination that the DOE did not meet its burden of showing that Clara Barton was an appropriate placement for E.G.[191]

## B.   IDEA: *Burlington-Carter* Prongs Two and Three

The SRO did not address whether Cooke was an appropriate unilateral placement or whether equitable considerations support the Parent's claim.[192]  Nor did the defendants address these issues in their briefs.  In contrast, the IHO addressed the second and third *Burlington-Carter* prongs at length in her opinion. The IHO laid out the applicable law,[193] addressed DOE challenges to plaintiffs' position,[194] and drew a well-reasoned conclusion in favor of the plaintiffs based on and with reference to testimony and documentary evidence.[195]  Therefore, I defer to the IHO's opinion regarding prongs two and three and find that Cooke was an appropriate placement and that the equities favor plaintiffs.

---

[191]    *See Rowley*, 458 U.S. at  206; IHO Decision at 12.

[192]    *See* SRO Decision at 19.

[193]    *See* IHO Decision at 13, 16.

[194]    *See id.* at 14–17.

[195]    *See id.* ("Having considered these issues, I find that they do not warrant finding that the Cooke program was not appropriate. . . .  I find that equitable factors support the Parents tuition reimbursement claim.").

**C.** **Rehabilitation Act § 504, Americans with Disabilities Act ("ADA"), and 42 U.S.C. § 1983 Claims**

**1.** **Rehabilitation Act § 504 and the ADA**

To make out a prima facie case under the Rehabilitation Act or the ADA, a plaintiff must show "(1) that he or she is a qualified individual with a disability, (2) that defendants are subject to the relevant statute; and (3) that he or she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his or her disability."[196]  Even where plaintiffs satisfy prongs one and two, to satisfy prong three, plaintiffs must show that defendants acted with bad faith or with gross misjudgment.[197]  The Second Circuit has likewise determined that where, as here, defendants have violated the IDEA, a "factual basis other than the alleged IDEA violations and the related allegation of discrimination" is required to support a section 1983 claim.[198]

Plaintiffs allege violation of the Rehabilitation Act, ADA, and section

---

[196]    *French v. New York State Dep't of Educ.*, 476 Fed. App'x 468, 473 (2d Cir. 2011) (summary order) (citing *Wenger v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997), *aff'd mem.*, 208 F.3d 204 (2d Cir. 2000)).

[197]    *See Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477, 483 (S.D.N.Y. 2007).

[198]    *French*, 476 Fed. App'x at 473.

1983, making a number of allegations that mirror plaintiffs' IDEA violation claim. However, plaintiffs do not allege that the defendants acted with bad faith or gross misjudgment.[199]  Specifically, plaintiffs fail to show that the alleged discrimination was anything more than the allegation that defendants failed to provide E.G. with a FAPE.  No evidence proving bad faith or gross misjudgment exists in the Record, and plaintiffs have neither alleged nor included further evidence beyond that presented to the IHO that would support an inference of prima facie discrimination to the extent required under any of the statutes.  Accordingly, I grant summary judgment for defendants as to the Rehabilitation Act, ADA, and section 1983 claims.

## VI.   CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED as to the IDEA claim and DENIED as to the Rehabilitation Act, ADA, and 42 U.S.C. § 1983 claims.  The defendants' cross-motion is DENIED as to the IDEA claim and GRANTED as to the Rehabilitation Act, ADA, and 42 U.S.C. § 1983 claims.  The Clerk is directed to close these motions (Dkt. Nos. 20, 25) and this case.

---

[199]     *See id.* (citing *Wenger*, 979 F. Supp. at 152).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 25, 2015

**- Appearances -**

**For Plaintiffs:**

Timothy Edward DeMasi, Esq.
Weil, Gotshal & Manges LLP (NYC)
767 Fifth Avenue, 25th Fl.
New York, NY 10153
(212)-735-4566
(212)-310-8007 (fax)
tim.demasi@weil.com

Rebecca Caren Shore, Esq.
Advocates for Children of New York, Inc, (NYC)
151 West 30th Street, 5th Flr.
New York, NY 10001
(212) 822-9574
(212) 947-9790 (fax)
rshore@advocatesforchildren.org

**For Defendants:**

Andrew James Rauchberg, Esq.
Assistant Corporation Counsel
New York City Law Department
100 Church Street, Room 4-114
New York, NY 10007
(212)-788-0889
(212)-788-0940 (fax)
arauchbe@law.nyc.gov